

# In the Court of Criminal Appeals of Texas

No. PD-0964-24

MARIAN FRASER, Appellant

v.

THE STATE OF TEXAS

On Appellant's Petition for Discretionary Review
From the Seventh Court of Appeals
McLennan County

YEARY, J., filed a concurring and dissenting opinion in which SCHENCK, P.J., and PARKER, J., joined.

I agree with the Court on its disposition of Appellant's sufficiency of the evidence issue and on its disposition of Appellant's complaint about the Court of Appeals decision relating to the necessity of a request for a limiting instruction. I join the Court's opinion as to those issues.

But I disagree with the Court's conclusion that the warrant affidavit was insufficient to provide the warrant-issuing magistrate with a substantial basis to conclude that the affiant-officer had probable cause to justify searching Appellant's cell phone. And I write only to explain my disagreement with the Court on that Fourth Amendment search issue.

On the strength of this Court's decision in *State v. Baldwin*, 664 S.W.3d 122 (Tex. Crim. App. 2022), the Court today concludes that "the court of appeals erred" when it held that "the trial court did not abuse its discretion in denying Appellant's pre-trial motion to suppress." Majority Opinion at 35. But the Court itself errs, by relying upon the flawed reasoning and holding from *Baldwin*, which the Court should immediately disavow. *Baldwin* conflicts with the decision of the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 235 (1983), and it was wrong on its own facts about the existence of probable cause in that case.

## I. PROBABLE CAUSE

Affidavits seeking warrants "'are normally drafted by nonlawyers in the midst and haste of a criminal investigation.'" *Id.* at 235 (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). That is why "[t]echnical requirements of elaborate specificity . . . have no proper place in this area." *Id.* In fact, the Supreme Court has explained that the "central teaching" of its decisions bearing on "the probable cause standard" is that "it is a 'practical, *nontechnical* conception.'" *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)) (emphasis added). As "its very name implies[,]" probable cause "deal[s] with

probabilities." *Id.* Probabilities "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.*

In assessing the existence of probable cause, "[f]inely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the magistrate's decision." *Id.* at 235. "Technical requirements of elaborate specificity" also "have no proper place in this area." *Id.* (quoting *Ventresca*, 380 U.S. at 108). The Supreme Court has observed that, "[i]f the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the warrant clause that might develop at the time of the search." *Id.* at 236. And the "possession of a warrant by officers conducting [a] . . . search greatly reduces the perception of unlawful or intrusive police conduct, by assuring 'the individual whose property is searched . . . of the lawful authority of the executing officer, his need to search, and the limits of his power to search.'" *Id.* (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977)).

Probable cause, ultimately, "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily or even usefully reduced to a neat set of legal rules." *Id.* at 232. In assessing whether it has been shown, "'only the probability, and not a prima facie showing, of criminal activity is the standard[.]'" *Id.* at 235 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "The task of the issuing magistrate is simply to make a practical, common-sense

decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. And "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238−39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." *Id.* at 236.

## II. *BALDWIN* SHOULD BE DISAVOWED BECAUSE IT CONFLICTS WITH *ILLINOIS V. GATES*

In *Baldwin*, this Court recently interjected a new and rigid test for ascertaining the existence of probable cause to search a cell phone. But that decision conflicts with the Supreme Court's call, in *Gates*, to only require a magistrate to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. It also violates *Gates* by demanding that reviewing courts do more than to simply "ensure that the magistrate had a 'substantial basis for concluding' that probable cause existed." *Id.* at 238−39.

In *Baldwin*, the Court on the one hand authorized the inclusion of what it called "*boilerplate language*" in an affidavit seeking to search a cell phone. *Baldwin*, 664 S.W.3d at 123 (emphasis added). The applying officer's affidavit in *Baldwin* clearly expressed his reasons for wanting to search the phone, and those reasons included some assertions that purported to be based on the officer's "training and

experience[.]"[1] *Id.* at 132. *Baldwin* used the term "boilerplate" to

---

[1] These parts of the affidavit are reproduced here:

Based on your Affiant's training and experience, Affiant knows that phones and "smartphones" such as the one listed herein, are capable of receiving, sending, or storing electronic data and that evidence of their identity and others may be contained within those cellular "smart" phones. Affiant also knows it is possible to capture video and photos with cellular phones. Further, Affiant knows from training and experience that cellular telephones are commonly utilized to communicate in a variety of ways such as text messaging, calls, and e-mail or application programs such as google talk or snapchat. The cellular telephone device, by its very nature, is easily transportable and designed to be operable hundreds of miles from its normal area of operations, providing reliable and instant communications. Affiant believes that the incoming and outgoing telephone calls, incoming and outgoing text messaging, emails, video recordings and subsequent voicemail messages could contain evidence related to this aggravated assault investigation.

Additionally, based on your Affiant's training and experience, Affiant knows from other cases he [sic] has investigated and from training and experiences that it is common for suspects to communicate about their plans via text messaging, phone calls, or through other communication applications. Further, Affiant knows from training and experiences that someone who commits the offense of aggravated assault or murder often makes phone calls and/or text messages immediately prior and after the crime.

Affiant further knows based on training and experience, often times, in a moment of panic and in an attempt to cover up an assault or murder that suspects utilize the internet via their cellular telephone to search for information. Additionally, based on your Affiant's training and experience, Affiant knows from other cases he has investigated and from training and experiences that searching a suspect's phone will allow law enforcement officers to learn the cellular telephone number and service provider for the device. Affiant knows that law enforcement officers can then obtain a subsequent search warrant from the cellular telephone provider to obtain any and all cell site data records, including any and all available geo-

describe this language. *See id.* at 135 ("[T]he magistrate erred by substituting the evidentiary nexus for the officer's training and experience and generalized belief that suspects plan crimes using their phones. The boilerplate language in itself is not sufficient to provide probable cause in this case[.]").

On the other hand, the Court then held that, any such "boilerplate" language in an affidavit seeking to search a cell phone "must be coupled with *other facts* and *reasonable inferences* *that establish* a nexus between the device and the offense." *Id.* at 123 (all emphasis added).[2] The plain import of the Court's holding therefore

---

location information for the dates of an offense, which may show the approximate location of a suspect at or near the time of an offense.

Based on Affiant's training and experience, as well as the totality of the circumstances involved in this investigation, Affiant has reason to believe that additional evidence consistent with robbery and/or murder will be located inside the cellular telephone, more particularly described as: a Samsung Galaxy5, within a red and black case, serial #unknown, IMEI #unknown. Affiant believes *127 that call data, contact data, and text message data, may constitute evidence of the offense of robbery or murder. Affiant marked the phone with the unique identifier HC16-0149834 and it is currently located at 601 Lockwood, Houston, Harris County, Texas.

*See Baldwin*, 664 S.W.3d at 126–27 (quoting the affidavit verbatim).

[2] Quite apart from the Fourth Amendment's constitutional demand for probable cause to conduct a search, Texas's statutory law requires an application for a warrant to search a cell phone to "state the facts and circumstances that provide probable cause to believe that (A) criminal activity has been, is, or will be committed; and (B) searching the telephone or device is likely to produce evidence in the investigation of the criminal activity described in Paragraph (A)." TEX. CODE CRIM. PROC. art. 18.0215(c)(5). But that provision, in reality, requires no more than the Fourth Amendment does:

demands that, before a magistrate may issue a warrant based on an affidavit seeking to search a cell phone, the magistrate must set to one side any statements in the affidavit that purport to be based on an officer's "training and experience," and then find still "other facts" establishing a "nexus between the device and the offense." This formula requires that an affidavit to search a cell phone contain facts showing probable cause to search a phone that are independent of any statements that are based on an officer's training and experience. And by imposing that special test on probable cause determinations, *Baldwin* violates the central tenet of *Gates*.

In *Gates*, after the Illinois courts uniformly agreed to suppress evidence obtained in searches of a car and home belonging to Mr. and Mrs. Gates, the Supreme Court addressed the continuing viability of the "two-pronged test" that had arisen from its opinions in *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969), for cases involving search warrant affidavits that relied on anonymous tips. *Gates*, 462 U.S. at 227−28. These prongs required an affidavit relying on an anonymous tip to (1) "adequately reveal the 'basis of knowledge'" of the person providing the tip, and (2) "provide facts sufficiently establishing either the 'veracity' of the affiant's information or . . . the 'reliability' of the informant's report in the particular case." *Id.* at 228-29. While agreeing with the Illinois courts that "veracity," "reliability," and "basis of knowledge," are all "highly relevant in determining the value" of an anonymous tip, the Supreme Court

---

Probable cause to believe that searching the phone will reveal evidence of the crime under investigation.

explained that it did not agree that "these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case[.]" *Id.* at 230. Instead, the Supreme Court said, "they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that [evidence of a crime will be] located in a particular place." *Id.* It concluded, finally, that "it [was] wiser to abandon the 'two-pronged test' established by [its] decisions in *Aguilar* and *Spinelli*[,]" and "reaffirm the totality-of-the-circumstances analysis that traditionally [had] informed probable cause determinations." *Id.* at 238.

*Baldwin*, however, has done again what *Gates* explicitly rejected. It has attempted to erect a new and rigid test—reminiscent of the *Aguilar* and *Spinelli* "two-pronged test"—for cases involving anonymous tips, but this time for cases involving requested cell phone searches. It demands that, while an officer's experience and training are nice to learn about in an affidavit seeking a warrant to search the contents of a cell phone, facts *independent* of that kind of information must *separately* demonstrate probable cause to search the phone. *Gates*, rejected that kind of rigid special-test approach to probable cause determinations and demanded adherence to "the totality-of-the-circumstances analysis that has traditionally informed probable cause determinations." *Id.* So *Baldwin*'s adoption of this new and rigid test should be immediately disavowed.

Furthermore, *Baldwin* also conflicts with *Gates* by encouraging reviewing courts to independently re-examine a magistrate's probable

cause determination while applying its own new and rigid test. *Gates* explained that the work of reviewing courts in relation to a magistrate's determination about the existence of probable cause has traditionally been limited. *See id.* at 236 ("[T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.") (*quoting Jones*, 362 U.S. at 271). *Gates* then concluded that "the duty of a reviewing court is *simply* to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238−39 (emphasis added). And while *Baldwin* gave lip service to this limitation, *Baldwin*, 664 S.W.3d at 131−32 (noting *Gates*'s requirement that reviewing courts should determine whether "[a] magistrate was provided with a substantial basis for concluding that probable cause existed"), it actually demanded that reviewing courts engage in a de novo search of warrant affidavits for probable cause to search a cell phone using its new exacting standard. *Id.* at 123 ("[T]o support probable cause, the language must be coupled with other facts and reasonable inferences that establish a nexus between the device and the offense. Because the affidavit in the instant case failed to do so, we discern no abuse of discretion[.]").

The Court relies on *Baldwin* in this case to reverse the court of appeals' judgment for upholding the reviewing trial courts' decision to deny Appellee's motion to suppress. But *Baldwin* was clearly wrong and in conflict with *Gates*. So, rather than reversing the court of appeals' judgment on the strength of *Baldwin*, the Court should instead

immediately disavow *Baldwin* and affirm the court of appeals' judgment affirming the trial court.

### III. *BALDWIN* SHOULD ALSO BE DISAVOWED BECAUSE IT WAS WRONG ON ITS OWN FACTS

*Baldwin* should also be disavowed because it was wrong on its own facts to conclude that the warrant failed to establish, even apart from the affiant-officer's statements derived from his own experience and training, a nexus between the phone and the offense. Even the *Baldwin* majority acknowledged its agreement with the State that "the Lexus that Baldwin was driving four days after the offense was linked to the capital murder." *Id.* at 131. The phone found in the car also belonged to Baldwin. He had it with him in the car when he was stopped, and he knew and revealed the number associated with it. *Id.* at 126. And because Baldwin was driving the car that was known to be connected to the people who committed the crime, so very close in time to its commission, he and his phone were also linked to the offense.

The Court lamented in *Baldwin* that, if it did not impose the strict new formula it established for determining whether there is probable cause to search a cell phone, then "all parties *suspected* of participating in an offense would be subject to having their cell phones searched, not because they used their phones to commit the crime, but *merely* because they owned cell phones." *Id.* at 134 (emphasis added). But the Court failed in its lament to recognize that, at least in Baldwin's case, there existed not only a *suspicion* that Baldwin was involved in the offense being investigated, but there was also actual *probable cause* to believe he was involved in it, and there was also probable cause to believe that he possessed the phone on or about his person when he was preparing

to commit, committing, and escaping from his commission of the crime that the officers were investigating. *See id.* at 385 (a "visitor from Mars might conclude [that a cell phone was] an important feature of human anatomy"). He was found only four days after the crime driving the very same vehicle that the perpetrators used to go to the crime scene and to flee when the crime was complete. And he did not just happen to own a cell phone somewhere in the world; he had his cell phone with him inside the car at the time he was detained—inside the car that he had used to drive to, and then escape from, the scene of the robbery/murder that the affiant-officer was investigating—because the phone was, after all, his phone. And because it was his, and it was with him when he was detained while driving that car, at least a reasonable inference was available that he also had it with him when he committed the crime. *Id.* ("anatomy").

To deny that these facts established a connection between the phone and the offense being investigated is to deny what is plain to every logical, thinking human on the planet—to include the Chief Justice and Associate Justices of United States Supreme Court. In 2014, Chief Justice Roberts of that Court wrote, in an opinion that was joined by Justices Scalia, Kennedy, Thomas, Ginsburg, Breyer, Sotomayor and Kagan, and concurred with by Justice Alito, that "it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their persons a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Riley v. California*, 573 U.S. 373, 395 (2014). Are we to conclude that cell phones contain all that personal information, but still we may not conclude that evidence

of a criminal suspect's crime will probably be found in the phone he keeps on or about his person?

Roberts' nearly unanimous Supreme Court majority opinion went on to say that "[i]n the cell phone context . . . it is reasonable to expect that incriminating information will be found on a phone regardless of when [a] crime occurred[,]" and that, "[i]t would be a particularly unimaginative law enforcement officer who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone." *Id.* at 399. His opinion explained that "[e]ven an individual pulled over for something as basic as speeding might well have location data dispositive of guilt on his phone[,]" and "[a]n individual pulled over for reckless driving might have evidence on the phone that shows whether he was texting while driving." *Id.* Perhaps the *Baldwin* majority would have us dismiss these musings by the Chief Justice of the United States Supreme Court—in nearly unanimous agreement with his fellow Justices—as mere "boilerplate."

In what is perhaps even more mere "boilerplate" language, the Supreme Court also acknowledged in *Riley* that "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises and can provide valuable incriminating information about dangerous criminals." *Id.* at 401. It explained that "[m]odern cell phones are not just another technological convenience[;] [w]ith all they contain and all they may reveal, they hold for many Americans 'the privacies of life[.]'" *Id.* at 403 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). Nothing in the Fourth Amendment requires law enforcement to check at the door their own

common-sense, well-known facts about human nature itself, and logic, in their investigations of criminal activity. *See United States v. Sokolow*, 490 U.S. 1, 8 (1989) ("Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers."). But that is where the Court has taken us with *Baldwin*.

This Court manifestly erred in *Baldwin* to dismiss the affiant-officer's recitation of his own experience and training in his warrant-affidavit. In those parts of his affidavit, the officer expressed his own reasons for believing that probable cause supported his desire to search Baldwin's phone. *Baldwin*, 664 S.W.3d at 126–27. His own statements described how his experiences and training informed his thoughts about how criminals use cell phones in such a way as to leave evidence of their crime behind, to be discovered if only law enforcement were permitted to look inside. And those statements powerfully supplemented the other facts recited in the affidavit that showed probable cause to believe that Baldwin committed the crime, and that he did so with his phone in tow only four days before he was stopped in traffic, still in possession of his phone—because, again, after all, it was his phone. *Id.* at 124–26.

The *Baldwin* majority concluded that "[t]he record, while viewed in the light most favorable to the magistrate's ruling, support[ed] the trial court's conclusion that the affidavit contained insufficient particularized facts to allow the magistrate to determine probable cause for a warrant to search the phone." *Id.* at 135. I urge the Court to admit that its conclusion in *Baldwin* was an error. *Of course* the officer's

affidavit there demonstrated probable cause to believe evidence of Baldwin's crime would be found on his phone. The Court was simply mistaken to conclude otherwise. And the Court should not compound the problem by perpetuating the *Baldwin* error. Instead, it should move forward, confidently affording appropriately great deference to magistrate judges' determinations about the existence or non-existence of probable cause and reviewing their determinations only for whether warrant-seeking affidavits provide a substantial basis to support their conclusions. *See Gates*, 462 U.S. at 238−39.

## IV. CONCLUSION

In *Baldwin*, this Court erected a rigid test for affidavits seeking warrants to search cell phones. But the Court's test is of the same hyper-technical sort explicitly rejected by the United States Supreme Court in *Gates*. We should reject such a rigid formula here and now and disavow our opinion in *Baldwin* on that ground. What is more, we should also disavow *Baldwin* because the affidavit in that case demonstrated a substantial basis for the issuing magistrate to find the existence of probable cause to search Baldwin's cell phone.

In *Riley v. California*, the U.S. Supreme Court demanded that, before officers may search a cell phone, they must "get a warrant." 573 U.S. at 403. The officers did that here. For the reasons I have expressed here, then, we should quickly abandon *Baldwin*'s rigid test and simply affirm the judgment of the court of appeals relating to the affidavit supporting the search warrant in Appellant's case.

**FILED:**                                    September 3, 2025
**PUBLISH**